IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

WARREN FORD,                          )
                                      )
        Plaintiff,                    )
                                      )
v.                                    )        Case No. 2:21-cv-29-RAH-SMD
                                      )                    [WO]
ERICK SMITHERMAN, *et al.*,           )
                                      )
        Defendants.                   )

**MEMORANDUM OPINION AND ORDER**

## I.  INTRODUCTION

Under Alabama law (the livestock law), it is unlawful to permit your cows to roam at large upon another person's property or the public roadways.[1]  This case concerns a confrontation and arrest arising out of a violation of this law.

On January 15, 2019, Chilton County Sheriff's Deputies Freeman Ellison and Jeffrey Brown arrested Chris Ford—Plaintiff Warren Ford's brother—at the Ford family residence for violating the Alabama livestock law as it concerned Chris's cows, which apparently had a persistent problem of roaming free.  Chris did not go willingly and physically resisted his arrest.  Warren and others at the residence confronted law enforcement by yelling profanities at the arresting deputies and repeatedly refusing their orders to back away.  Backup was called because of the

---

[1] *See* Ala. Code §§ 3-5-2; 13A-7-61.

1

escalating situation, thereby resulting in the arrival of additional law enforcement officers at the residence, including Sergeant James Davis, Officer Erick Smitherman, and Officer Corry McCartney.

Officer McCartney attempted to arrest Warren. Warren also resisted, and a physical struggle ensued during which Warren was tased. Warren ultimately was subdued, arrested, and then transported to jail where he was charged with misdemeanor offenses for obstruction and resisting arrest. After later being acquitted of the criminal charges levied against him, Warren brought this suit alleging violations of his Fourth Amendment rights and conspiracy.[2]

Pending before the Court are the Defendants' motions for summary judgment (Docs. 56, 58), Warren's partial motion for summary judgment (Doc. 59), and the Defendants' joint motion to strike (Doc. 68). After reviewing the parties' submissions, the Court concludes that summary judgment is due to be granted in favor of the Defendants, Warren's motion denied, and the Defendants' joint motion to strike denied as moot.

---

[2] To the extent that Warren's Second Amended Complaint could be construed as bringing claims under Alabama state law, Warren has abandoned any such claims by failing to address them in his summary judgment briefing. *See Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

## II.    JURISDICTION AND VENUE

Original subject matter jurisdiction exists over Warren's federal claims under 28 U.S.C. § 1331.  Personal jurisdiction and venue are uncontested, and venue properly lies in the Middle District of Alabama.  *See* 28 U.S.C. § 1391.

## III.    BACKGROUND[3]

On January 15, 2019, Deputy Ellison and Deputy Brown traveled to Chris Ford's residence to serve an arrest warrant stemming from Chris's cows being in a public roadway.  Chris's cows had been a persistent problem, as he had been previously warned by the sheriff's office.  (*See* Doc. 55-8.)  When the deputies informed Chris that they had a warrant for his arrest, Chris declared that he was not going to jail and walked away.  (*See* Doc. 55-15.)  After being instructed to stop, Chris complied, and Deputy Brown began to handcuff him.

Several individuals, including Warren, exited the house and began yelling and cursing at the deputies while they attempted to handcuff Chris.  Chaos then followed.  Warren repeatedly yelled at the deputies while calling the deputies profane names.  (*Id.*; Doc. 55-7 at 18.)  Deputy Ellison instructed Warren and the others to back up,

---

[3] In his response in opposition to the Defendants' summary judgment motions, Warren attempts to dispute many of the Defendants' factual assertions by citing to an unsworn declaration.  (*See* Docs. 75, 76.)  Since it is not signed nor dated, it will not be considered.  *See Roy v. Ivy*, 53 F.4th 1338, 1347–48 (11th Cir. 2022); *see also* 28 U.S.C. § 1746 (providing that unsworn declarations may serve as a substitute for sworn affidavits or sworn declarations when certain statutory requirements are met).

but Warren failed to comply, instead yelling "I'm not going nowhere!"  Warren's yelling and confrontation continued.

During the confrontation, Chris pulled away from the arresting deputies and a physical struggle ensued.  Deputy Brown then tased Chris, bringing Chris to his knees on the ground.  Once the deputies secured Chris in handcuffs, Deputy Ellison called for backup.  Chris was then placed in Deputy Brown's patrol vehicle.  As this physical struggle unfolded between Chris and the deputies, Warren continued yelling at the deputies and again refused their orders to back away.

Approximately ten minutes later, Sergeant Davis and Deputy Edwin Freeman with the Chilton County Sheriff's Department; Officers Corry McCartney, Erick Smitherman, and Brent Overton with the Clanton Police Department; and State Trooper James Earnhardt arrived in response to Deputy Ellison's call for assistance.

Despite their arrival, Warren continued with his verbal protest.  At one point, Officer McCartney told Warren to shut his mouth or he too would go to jail.  (Doc. 55-15 at 13:10; Doc. 55-4 at 14.)  Then, Officer Smitherman instructed Warren to take his hands out of his pockets,  (Doc. 55-15 at 13:17; Doc. 55-3 at 11), and Officer McCartney asked for a pair of handcuffs, (Doc. 55-15 at 13:20).  As Officer McCartney reached for Warren's hand to handcuff him, Warren pulled away.  (Doc. 55-4 at 17.)  Another physical struggle ensued, this time between Officer McCartney and Warren.  (*Id.*)  As Officer McCartney forced Warren to the ground, Deputies

4

Brown and Freeman and Trooper Earnhardt assisted McCartney in subduing Warren, with Freeman using a taser, and securing him in handcuffs.  (Doc. 67-1 at 2–4.)  Warren was then taken to jail and formally charged with two criminal counts: obstructing governmental operations in violation of Ala. Code § 13A-10-2, and resisting arrest in violation of Ala. Code § 13A-10-41(a).  (Doc. 55-11 at 38–39.) He was later acquitted of both criminal charges. (Doc. 59-2 at 66.)

## IV.   STANDARD OF REVIEW

Summary judgment is appropriate where the materials in the record show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c); *see also Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("For factual issues to be considered genuine, they must have a real basis in the record." (citation omitted)).  No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of his case as to which he would have the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The "mere existence of a scintilla of evidence in support of the [non-moving party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986).  To prevent summary judgment, a factual dispute must be both material and genuine.  *Id.* at 247–48.  A fact is "material" if it has the potential of "affect[ing] the outcome" of the case.

*Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (quoting *Anderson*, 477 U.S. at 248). And to raise a "genuine" dispute of material fact sufficient to preclude summary judgment, "the nonmoving party must point to enough evidence that 'a reasonable juror could return a verdict'" in his favor. *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (citation omitted).

"When considering the record on summary judgment, 'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor,'" *id.* (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)), but "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment," *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Further, in cases where a video in evidence obviously contradicts the nonmovant's version of the facts, a court accepts "the video's depiction instead of the [nonmovant's] account," *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010), and "view[s] the facts in the light depicted by the videotape," *Scott*, 550 U.S. at 380–81. But where the video does not answer every question or resolve all the details of an encounter, a court must view the evidence in the light most favorable to the non-moving party, *Johnson v. City of Miami Beach*, 18 F.4th 1267, 1269 (11th Cir. 2021), where there is "material evidence in the record supporting

both [parties'] accounts," *Cantu v. City of Dothan*, 974 F.3d 1217, 1227 (11th Cir. 2020) (quoting *Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016)).

Finally, "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citation omitted).

## V.   DISCUSSION

The Defendants move for summary judgment on the basis that Warren cannot succeed on the merits of his claims and, alternatively, their entitlement to qualified immunity.  Warren moves for partial summary judgment, arguing that his arrest was unlawful and thus any amount of force used against him violated his constitutional rights.  The Court will proceed to analyze the parties' arguments on a count-by-count basis.

### A. Count I: Excessive Force — Unlawful Use of a Taser (McCartney)

In Count I, Warren raises a Fourth Amendment excessive force claim against Officer McCartney, alleging that McCartney tased him multiple times while effectuating an unlawful arrest.  McCartney argues his entitlement to summary judgment because there is no evidence that he tased Warren.[4]  Warren concedes as

---

[4] Because it is undisputed that Officer McCartney did not use a taser during Warren's arrest, the Court declines to separately analyze McCartney's assertion of qualified immunity.

much in his briefing, stating that Deputy Brown is the person who actually tased him, (Doc. 59 at 14–15; Doc. 75 at 13, 25–26), while also simultaneously claiming that he does not know which officer tased him because he was face down when a taser was deployed (Doc. 76 at 10, 14).

Warren also argues that he is entitled to summary judgment on Count I because, according to him, his arrest was unlawful, and thus any force used, no matter how minimal, was unconstitutional.  But Warren's excessive force claim in Count I is predicated *only* on Officer McCartney's alleged use of a taser against him. Whether Warren's arrest was lawful is irrelevant as to his excessive force claim in Count I as Warren has presented no evidence that McCartney actually used a taser during that day's events.  As such, Warren is not entitled to summary judgment on this claim.  Rather, summary judgment is due to be granted in McCartney's favor on Count I.

## B. Count II: Conspiracy to Violate Constitutional Rights — Unlawful Seizure (Brown and Ellison)

In Count II, Warren asserts a civil conspiracy claim against Deputy Brown and Deputy Ellison, alleging that they conspired to carry out an unlawful arrest and

to use excessive force against him.  Brown and Ellison argue that Warren's claim is barred by the intracorporate conspiracy doctrine.[5]

"The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy."  *Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001) (quoting *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc)).  That is, "a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves."  *Id.* (quoting *McAndrew*, 206 F.3d at 1036). The Eleventh Circuit has held that the intracorporate conspiracy doctrine also applies to public entities and its employees.  *Grider v. City of Auburn*, 618 F.3d 1240, 1261 (11th Cir. 2010).  To determine whether the intracorporate conspiracy doctrine bars a plaintiff's § 1983 conspiracy claim, a court should consider whether (1) anyone outside the entity was involved, and (2) whether the "defendant acted within his scope of employment."  *Id.* at 1261.

At the time of Warren's arrest, Deputy Brown and Deputy Ellison were both employed by the Chilton County Sheriff's Department and were making arrests within the scope of their employment with the sheriff's department.  There is no

---

[5] As the intracorporate conspiracy doctrine is dispositive, the Court does not address Brown and Ellison's other grounds for summary judgment.

allegation or evidence that Brown or Ellison's conduct constituted a criminal conspiracy in violation of the federal criminal code, an exception to the intracorporate conspiracy doctrine. *See Grider*, 618 F.3d at 1263. Accordingly, the intracorporate conspiracy doctrine is applicable here and bars Warren's civil conspiracy claim against Deputy Brown and Deputy Ellison, even if their actions violated Warren's constitutional rights.[6] As such, Deputy Brown and Deputy Ellison are entitled to summary judgment in their favor on Count II.

## C. Count III: Conspiracy to Violate Constitutional Rights — False Imprisonment (All Defendants)

In Count III, Warren asserts a civil conspiracy claim against all Defendants, alleging that they conspired to falsely imprison him. To succeed on this claim, Warren must prove the existence of a conspiracy by showing that the individual defendants "reached an understanding" to deny his constitutional rights. *Grider*, 618 F.3d at 1260 (quoting *Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty.*, 956 F.2d 1112, 1122 (11th Cir.1992) ("[T]he linchpin for conspiracy is agreement.")). The existence of a § 1983 conspiracy may be based on circumstantial evidence. *Id.*

The Defendants argue that Warren cannot prove the existence of a conspiracy. Warren responds, but barely. He merely asserts that the Defendants are liable under

---

[6] In his responsive briefing, Warren makes a belated attempt to expand his conspiracy claim in Count II to include the other Defendants. (*See* Doc. 75 at 27.) Warren will not be permitted to amend his complaint through summary judgment briefing. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).

Count III, but he provides no substantive argument or citations to any evidence regarding the existence of this alleged conspiracy. Conspiracy claims cannot rest upon such conclusory assertions. *See Johnson v. Warden*, 491 F. App'x 60, 62 (11th Cir. 2012) (per curiam) (plaintiff failed to show a triable issue of fact where he "failed to present any non-conclusory and meaningful evidence that the [defendants] reached an agreement to violate his constitutional rights" (citing *Rowe v. City of Fort Lauderdale,* 279 F.3d 1271, 1283–84 (11th Cir. 2002)). The Defendants are entitled to summary judgment in their favor on Count III.

**D. Count IV: Failure to Intervene (All Defendants)**

In Count IV, Warren alleges that each Defendant failed to intervene and prevent Warren's false arrest and the use of excessive force. The Defendants assert their entitlement to qualified immunity.

Government officials sued in their individual capacities are protected by qualified immunity unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Eleventh Circuit has established a two-part test to determine whether a defendant is entitled to qualified immunity. First, the defendant must show that he was "engaged in a 'discretionary function' when he performed the acts of which the plaintiff complains." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004) (quoting *Harlow*, 457 U.S. at 818).

Second, if the court concludes the defendant was engaged in a discretionary function, "the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity." *Id.*   To do so, the plaintiff must show "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id.*

### 1. Discretionary Function

Relying on *Telfare v. City of Huntsville*, 841 So. 2d 1222 (Ala. 2002), Warren argues that none of the Defendants were acting within the scope of their discretionary authority because the Defendants did not have discretion to arrest Warren for a misdemeanor offense not committed in their presence.   In other words, they could not arrest him for a misdemeanor that they did not personally observe.

*Telfare* is not applicable here, as *Telfare* involved the issue of discretionary authority under state law immunity principles, not a discretionary function under federal qualified immunity principles.   While somewhat similar, the analysis and implications are different.   *See Mann v. Darden*, 630 F. Supp. 2d 1305, 1318 n.8 (M.D. Ala. 2009); *see also Exford v. City of Montgomery*, 887 F. Supp. 2d 1210, 1221 & n.3, 1231–32 (M.D. Ala. 2012) (declining to apply *Telfare* under the federal qualified immunity analysis).

Under federal principles applicable to the discretionary function analysis, courts "look to the general nature of the defendant's action, temporarily putting aside

the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman*, 370 F.3d at 1266.  In other words, the question is not whether the official acted lawfully or performed a lawful arrest, but instead whether the official acted within the outer perimeter of his discretionary duties.

Both this Court and the Eleventh Circuit have found that a law enforcement officer is engaged in a discretionary function for qualified immunity purposes even when the officer conducts an arrest for a misdemeanor offense that the officer did not personally observe.  *See Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332–33 (11th Cir. 2004); *Jernigan v. City of Montgomery*, No. 2:17-cv-44-ECM, 2019 WL 4017387, at *3 n.3 (M.D. Ala. Aug. 26, 2019).  Effectuating arrests and responding to calls for backup assistance clearly fall within the outer perimeters of the discretionary functions of a law enforcement officer.  *See, e.g., Crosby*, 394 F.3d at 1332.  The Court concludes that each Defendant here was engaging in a discretionary function.

## 2. Constitutional Violation

To overcome the Defendants' assertion of qualified immunity, Warren must show that each Defendant violated Warren's clearly established constitutional rights. Warren has not made that showing.

13

A law enforcement officer can be directly liable under § 1983 when he "fails or refuses to intervene when a constitutional violation . . . takes place in his presence." *Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019) (citation omitted). A failure to intervene claim stems from and is "wholly dependent" on an underlying constitutional violation. *Id.* Thus, to succeed on such a claim, the plaintiff must prove both (1) that a constitutional violation occurred; and (2) that the defendant officer was "in a position to intervene" yet failed to do so. *Id.* (citation omitted). Of course, if no constitutional violation was being committed, then an officer cannot be liable for failing to intervene. *Id.* ("Plainly, an officer cannot be liable for failing to stop or intervene when there was no constitutional violation being committed."); *Crenshaw v. Lister*, 556 F.3d 1283, 1294 (11th Cir. 2009) (holding that defendant officer had no duty to intervene where the use of force was not excessive).

Here, Warren's failure to intervene or prevent claim is predicated on two events—his allegedly unlawful arrest and the use of force against him. Whether Warren has proven that his arrest was unlawful will be addressed first.

### a. Warren has failed to establish that his arrest was unlawful.

Warren was arrested on two criminal charges: (1) Obstruction of Governmental Operations under Ala. Code § 13A-10-2, and (2) Resisting Arrest under Ala. Code § 13A-10-41(a). The Defendants concede there was no probable

cause, even arguable probable cause, to arrest Warren for obstruction under Ala. Code § 13A-10-2 because the statute expressly provides that it does not apply "to the obstruction, impairment or hindrance of the making of an arrest."  Ala. Code § 13A-10-2(b).   The Defendants instead argue that probable cause, or arguable probable cause, existed under Ala. Code § 13A-10-41(a) to arrest Warren for resisting during his brother Chris's arrest.

Warren again relies on *Telfare* to argue that his arrest was unlawful. According to Warren, since Officer McCartney did not arrive at the scene until after Chris's arrest, McCartney had no knowledge of Warren's actions during Chris's arrest to justify arresting Warren for resisting during Chris's arrest.  The Eleventh Circuit rejected a similar *Telfare*-based argument in *Crosby*, *see* 394 F.3d at 1333, and previously in a suit arising under a similar Florida law in *Knight v. Jacobson,* 300 F.3d 1272, 1276 (11th Cir. 2002).  As such, it must also be rejected here.

Rather, whether an arrest was unlawful under the Fourth Amendment turns on whether it was supported by probable cause.  *See Gerstein v. Pugh*, 420 U.S. 103, 111 (1975).  "Probable cause" is defined as "facts and circumstances 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'"  *Id.* (citation omitted).  "Probable cause may exist based on the collective knowledge of law enforcement officials derived from reasonably trustworthy information."  *Grider*, 618 F.3d at 1257.  Notably, probable cause

"requires only 'a probability or substantial chance of criminal activity, not an actual showing of such activity,'" *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018) (citation omitted), which the Supreme Court has emphasized "is not a high bar," *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018).

Additionally, to overcome the defense of qualified immunity, Warren must show a lack of arguable probable cause, which exists where "reasonable officers in the same circumstances and possessing the same knowledge as the defendant[s] *could* have believed that probable cause existed to arrest." *Id.* at 1298 (11th Cir. 2010) (alteration adopted) (citation omitted).

"Whether an officer has probable cause or arguable probable cause, or neither, 'depends on the elements of the alleged crime and the operative fact pattern.'" *Id.* (citation omitted). Under Alabama law, "[a] person commits the crime of resisting arrest if he intentionally prevents or attempts to prevent a peace officer from affecting a lawful arrest of himself or of another person," which is classified as a misdemeanor offense. Ala. Code § 13A-10-41.

Viewing the facts in the light most favorable to Warren, the Defendants had probable cause, or at a minimum arguable probable cause, to arrest Warren for resisting during the arrest of his brother, Chris. During Chris's arrest, Warren repeatedly ignored orders from law enforcement to back away while simultaneously yelling profanities at the deputies from only a few feet away. Deputy Ellison then

called for backup as he and Deputy Brown regained control over Chris, stating that they were fighting with a suspect and that there were "more than one of them." (Doc. 55-15 at 3:05.)  Officer McCartney responded to the call and learned from Deputy Ellison that Warren needed to be taken into custody while Warren continued to yell at and verbally confront law enforcement.   Officer McCartney then instructed Warren to be quiet and proceeded to arrest him.  Based on the collective knowledge of law enforcement at the scene, the Defendants had probable cause, or at a minimum arguable probable cause, to believe that Warren had resisted during Chris's arrest. *Cf. Ransom v. Sherman*, No. 5:14-cv-1795-CLS, 2016 WL 10679537, at *9 (N.D. Ala. Nov. 8, 2016), *aff'd* 697 F. App'x 638 (11th Cir. 2017) (per curiam) (finding that the defendant had at least arguable probable cause to arrest the plaintiff for resisting arrest when the plaintiff's "loud, angry yelling and refusal to follow orders distracted" the arresting officers from taking the suspect into custody).

Warren argues that Officer McCartney did not have probable cause or arguable probable cause because McCartney was not physically present to witness Warren's actions during Chris's arrest.  But again, probable cause can exist "based on collective knowledge of law enforcement officials derived from reasonably trustworthy information." *Grider*, 618 F.3d at 1257.  And here, not only did Deputy Ellison and Deputy Brown personally witness Warren's behavior, but Officer McCartney also overheard Deputy Ellison say that Warren needed to be taken into

custody for resisting during Chris's arrest.  Warren disputes that Officer McCartney overheard Deputy Ellison's statement, but he does not dispute that Ellison made such a statement.[7]  And whether Deputy Ellison's statement was directed to a specific law enforcement officer is without import as Warren has not sufficiently rebutted McCartney's testimony that he learned from Ellison that Warren resisted during his brother's arrest.[8]

Warren also argues that his arrest was unlawful because he was subsequently acquitted of both criminal charges.  But for qualified immunity purposes, this fact has no bearing on whether arguable probable cause existed at the time of Warren's arrest.  *See Scarbrough v. Myles*, 245 F.3d 1299, 1303 n.8 (11th Cir. 2001) (for qualified immunity purposes, the issue is whether the defendant "violated clearly established law in making the arrests based on the objective factors that gave rise to his probable-cause determination and not whether the arrestees' actions actually

---

[7] Specifically, Warren disputes Officer McCartney's testimony that McCartney overheard Deputy Ellison tell Sergeant Davis that Warren needed to be taken into custody because Davis testified that (1) he arrived at the scene after McCartney and (2) that he did not know why Warren was arrested.  But Warren does not cite Davis's testimony to dispute whether Deputy Ellison actually made such a statement, but rather to dispute only whether Officer McCartney had knowledge of Warren's behavior during Chris's arrest.

[8] The video and audio evidence from Deputy Brown's bodycam supports Officer McCartney's version of events to the extent that he claims that he learned from Deputy Ellison that Warren needed to be arrested based on his actions during Chris's arrest.  During Chris's arrest, Deputy Ellison can be seen calling for backup and stating that they were fighting with a suspect and that there was "more than one of them."  (Doc. 55-15 at 3:05.)  Later in the video, after Officer McCartney responded to the call, an unidentified voice can be heard saying: "Basically, we fought with him, and about one two, and one more in the house.  We got him handcuffed . . [inaudible]."  (Doc. 55-15 at 12:40.)

constituted a crime"); *see also Wood v. Kessler*, 323 F.3d 872, 876, 880 (11th Cir. 2003) (holding defendant officer had probable cause to arrest plaintiff for reckless driving even though plaintiff was ultimately found not guilty, thus entitling the defendant officer to qualified immunity on a false arrest claim).

Based on the forgoing, Warren has not established that his arrest was unlawful in a constitutional sense to support his derivative failure-to-intervene claim. *See Sebastian*, 918 F.3d at 1312; *Crenshaw*, 556 F.3d at 1294. Accordingly, the Defendants are entitled to qualified immunity to the extent Warren claims they failed to intervene in his arrest.

### b. Warren has failed to establish that the use of force against him was excessive.

Warren also alleges that the Defendants are liable for failing to intervene and to prevent the use of excessive force against him. In cases involving failure-to-intervene in the use of excessive force, "[a]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be liable for failing to intervene, so long as he was in a position to intervene yet failed to do so." *Alston v. Swarbrick*, 954 F.3d 1312, 1321 (11th Cir. 2020) (quotations omitted). To overcome qualified immunity on this theory, Warren must first establish that the use of force used against him was excessive.

The use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989). But, "the

right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. Additionally, the Eleventh Circuit has recognized that "the typical arrest involves some force and injury." *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002).

Warren argues that the use of force against him by Officer McCartney was excessive because his underlying arrest was unlawful. But the Court has already determined that Warren has failed to establish that his arrest was unlawful, thus Warren cannot rely on the mere lawfulness of the arrest to establish that the amount of force used against him was excessive. Rather, "[w]here probable cause or arguable probable cause to arrest existed," whether the use of force was excessive turns on "whether the officer's actions were 'objectively reasonable' in light of the facts and circumstances they faced at the time, 'including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008) (quoting *Graham*, 490 U.S. at 396). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

Warren relies on *Graham v. Connor,* 490 U.S. 386 (1989), and *Hunter v. Leeds*, 941 F.3d 1265 (11th Cir. 2019), to argue that the force used against him was disproportionate to any threat he may have posed and thus was unreasonable. But Warren does not explain, nor can the Court find, how *Graham* or *Hunter* is remotely comparable to the facts presented here as there is no evidence that Warren suffered a physical injury from the amount of force used against him, *cf. Graham*, 490 U.S. at 390 (involving physical force resulting in severe, permanent physical injury), nor does this case involve the use of deadly force, *cf. Hunter*, 941 F.3d at 1272.

Considering Warren's confrontational behavior—that is, continuously yelling profanities[9] toward the officers and repeatedly ignoring the officers' orders to back away—Warren has failed to show that the amount of force used by the officers to control Warren was unreasonable. *See Merricks v. Adkisson*, 785 F.3d 553, 563 (11th Cir. 2015) ("If . . . the force was applied when the officer was trying to take

---

[9] Somewhat confusingly, Warren, citing *Swann v. City of Huntsville*, 455 So. 2d 944, 950 (Ala. Crim. App. 1984), argues that "[t]o the extent Defendant McCartney attempts to justify his unlawful use of force based on choice words from Mr. Ford, Alabama long ago put this smoke screen of a defense to bed." (Doc. 76 at 20.) Notwithstanding the fact that *Swann* was decided on an appeal from a state criminal conviction, *Swann* is not applicable as the appellant in that case was convicted for disorderly conduct, 455 So. 2d at 950, whereas here Warren was charged with resisting arrest. More importantly, determining whether an officer's use of force was excessive is considered under the "totality of circumstances." *See Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). Thus, whether Warren was yelling profanities towards the officers is a relevant consideration as to whether the amount of force at issue here was reasonable under the totality of the circumstances. *See, e.g., Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (finding that defendant officer's use of a taser was not excessive force when, among other factors, the plaintiff "used profanity, moved around and paced in agitation, and repeatedly yelled at [the defendant officer]").

control of the suspect or the situation confronting him, the officer can make a much better claim to the qualified immunity defense."); *cf. Taylor v. Taylor*, 649 F. App'x 737, 746 (11th Cir. 2016) (holding that an officer's use of force was not excessive where "during the course of a permissible arrest, [the officer] grabbed [the plaintiff] without warning, slammed her against a patrol car several feet away, causing her head to hit the car first, and then handcuffed her," which caused the plaintiff to suffer "a spiral fracture in her hand and bruising to her hand, forearm, right upper eyelid, and chest" (citing *Nolin v. Isbell*, 207 F.3d 1253, 1255 (11th Cir. 2000)); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (holding that during a "difficult, tense and uncertain situation" the use of a taser gun to subdue a suspect who had repeatedly ignored police instructions and continued to act belligerently toward police was not excessive force).

Even assuming *arguendo* that Warren had shown that the amount of force used against him was excessive, his derivative failure-to-intervene claim would still fail. First, Officer McCartney cannot be held liable for failing to intervene in his own use of force, and as such, the claim against him fails on fundamental grounds. *See Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) ("[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim *of another officer's use of excessive force*, can be held liable for his nonfeasance." (alteration in original) (emphasis added) (citation omitted)); *Ensley v. Soper*, 142

F.3d 1402, 1407 (11th Cir. 1998) ("[I]n order for an officer to be liable for failing to stop police brutality, *the officer must be 'in a position to intervene.'* (emphasis added) (citation omitted)).  Second, Warren has not cited evidence or argued that the other Defendants had time to prevent the use of force against him during this tense, rapidly developing situation.  *Cf. Hadley*, 526 F.3d at 1331 (defendant officer entitled to qualified immunity where the plaintiff "presented no evidence from which a reasonable jury could find that [the defendant officer] could have anticipated and then stopped [the arresting officer]" from using excessive force); *Jackson v. Sauls*, 206 F.3d 1156, 1174 (11th Cir. 2000) (defendant officer was not liable for failing to intervene in the use of excessive force where there was no evidence that he had time to prevent the use of force).

Warren has failed to establish the existence of an underlying constitutional violation or that the Defendant officers were in a position to intervene to support his failure-to-intervene claim and to overcome the Defendants' assertion of qualified immunity.  Accordingly, summary judgment is due to be granted in favor of the Defendants on Count IV.

## VI.   CONCLUSION

Based on the forgoing, it is **ORDERED** as follows:

1. Defendants' Motions for Summary Judgment (Docs. 56, 58) are **GRANTED**;

2. Plaintiff Warren Ford's Partial Motion for Summary Judgment (Doc. 59) is

   **DENIED**; and

3. Defendants' Joint Motion to Strike (Doc. 68) is **DENIED** as moot.

4. A separate judgment will issue.

   DONE, on this the 17th day of April 2023.

   R. AUSTIN HUFFAKER, JR.
   UNITED STATES DISTRICT JUDGE